No. 14,093.

CHARLES R. BELL VS. THE GLOBE LUMBER COMPANY, LIMITED.

### SYLLABUS.

1. The master is not bound, absolutely, to his servants for the competency of their fellow servants, engaged in the same common employment, and is guilty of a fault, and becomes liable to the servant injured, only when the fellow servant, through whose incompetency, or negligence, the injury is inflicted, has been employed, or retained, with knowledge of his unfitness, or when the master has failed to exercise reasonable diligence and care to inform himself, and keep himself informed, as to his qualifications. Hence, a mere allegation of injury, caused by the incompetency, or negligence, of a fellow servant, imputes no fault to the master, and discloses no cause of action against him, and an exception to that effect should be decided before trial, if a decision is requested, and not referred to the merits. Hence, also, it is error to charge the jury that the "general allegation that the damage was caused by the employe is sufficient notice to the defendant that he knew of the incompetency of the employe."

2. Where, however, in such a case, the exception of "no cause of action" is referred to the merits, by the court, and, upon the trial on the merits, the defendant, without objection, permits evidence to be introduced tending to establish facts which, if alleged, would have disclosed a cause of action, he allows the ground upon which his exception is based to be taken from under it and, thereby, in effect, allows the petition to be amended and its defects cured.

3. Whilst the doctrine of the non-liability of the master for injury sustained by a servant in his employ, through the incompetency or negligence of another servant employed by him, has not been recognized in this State as including certain classes of cases to which it has been applied by the English, and by, some, American, courts, the ordinary case of a brakeman injured through the incompetency or negligence of an engineer, when both are engaged in handling the same train, in the service of the same employer, is one to which, under our jurisprudence, as well as the jurisprudence elsewhere, that doctrine is properly applicable.

4. Both reason and authority sustain the proposition that where the work for which the servant is employed is such as to involve risk to the lives and persons of others the master is required, upon engaging such servant, to make reasonable investigation into his character, skill and habits of life. And, where a company, operating a railway, employs a person as engineer and assigns him to the duty of running a locomotive, without requiring him to produce credentials of any kind, without inquiry, except such as is made of the person, himself, as to his competency for the discharge of that duty, and with no knowledge of him, save that derived from his having worked for it as a steam, and water, fitter, and machinist, such company is guilty of negligence, and is liable for injury resulting to a fellow-servant from the incompetency or negligence of such engineer.

Bell vs. Lumber Co., Ltd.

5.  The general rule, no doubt, is, that, where a servant is aware of the incompetency of a fellow-servant and, nevertheless, accepts employment and works with him, without objection or notice to the common master, he thereby accepts the risk, so far as the master is concerned, of such incompetency. In the instant case, however, whilst it appears that the plaintiff, a brakeman, by reason of a limited experience in switching cars, upon tne day of the accident, concluded that the engineer, who had been assigned to duty for the first time, did not know how to handle the engine, it also appears that, when the train was taken out, shortly after such switching, the superintendent of the road went on the engine, and the engineer, thereafter, acted under his orders, or in his immediate presence, or both. It is, therefore, held that, notwithstanding the opinion, or limited knowledge, of the brakeman, he had the right to assume that the company, itself, thus present, through its superintendent, would see that the duties of the engineer were properly discharged.

6.  Where a train is made up of skeleton (log) cars, the footing upon which is precarious, it is negligence for the engineer to reverse his engine without warning, since he thereby subjects the brakemen, taken unawares, to the danger of being thrown off.

7.  The plaintiff in this case lost a leg. He has been awarded, by the verdict and judgment appealed from, the sum of $10,000. This amount is reduced to $6000.

APPEAL from the Second Judicial District, Parish of Webster—
Watkins, J.

J. Henry Shepherd and Lynn K. Watkins, for Plaintiff, Appellee.

Stewart & Stewart and William Rufus Cowley, for Defendant, Appellant.

### STATEMENT OF THE CASE.

The opinion of the court was delivered by

MONROE, J.  This is an action in damages for personal injuries. There was a verdict and judgment for plaintiff in the sum of $10,000, from which the defendant has appealed.

The plaintiff alleges, in substance, that he was employed as a brakeman on a short railway operated by the defendant for the purposes of its saw mill; that he was on a train which was under full headway, when, without warning of any kind, the engine was reversed and the speed of the train checked so suddenly as to throw him on the track, with the result that the wheels of the car passed over one of his legs, crushing it in such a manner as to necessitate amputation.  Then fol-

low allegations as to his sufferings and impaired earning capacity, and he further alleges "that he was without fault and that the said injury is wholly due to the gross carelessness of the defendant company and the superintendent of the said company and the engineer and agents and servants of said company; that the superintendent gave the order to stop, to said engineer; that the stop was not at a usual stopping place, but was unusual; that the engineer was incompetent to operate a locomotive, and that by a proper handling of said locomotive petitioner would not have been injured."

The defendant filed an exception of "no cause of action," which, by order of the court, was referred to the merits. And, thereafter, "first reserving all rights under said exception," the defendant answered, denying generally the allegations of the petition; specially denying that plaintiff's injuries resulted from its fault; and averring that plaintiff was an experienced railroad man and assumed the risks incident to the service in which he was employed, including those resulting from any negligence of his fellow servant, the engineer. It does not appear that the defendant insisted that his exception of "no cause of action" should be ruled on, separately, and, upon the trial on the merits, evidence was offered on behalf of the plaintiff, to which no objection was interposed, showing the incompetency of the engineer. Counsel for defendant, however, requested the judge to charge that the simple allegation that the injury was caused by the negligence, or incompetency, of a co-employe, or fellow servant, is not sufficient and does not state a cause of action, unless it is further alleged that such negligence, or incompetency, was known to the employer."

The charge as given in response to this request was as follows: "Gentlemen of the jury, I have been requested to state to you" (repeating the charge asked). "I will state to you that, in the opinion of the court under the general allegation that the damage was caused by the employe that is sufficient notice to the defendant that it is contended that he knew of the incompetency of the employe who is charged to have been the cause of the damage. If they should, by omission, fail to make the allegations in the petition as strong as they should be, and if there is proof introduced which covers that defect, and that proof is introduced without objection, that it is omitted, in that case the portion of the evidence being received without objection completely cures the defects in that regard." To this, the defendant, through its counsel, reserved a bill of exceptions.

The facts, in addition to those stated, disclosed by the evidence adduced on the trial, are as follows:

The plaintiff was about twenty-six years of age, and had been working as a brakeman, and otherwise, on railroads, for fifteen years, or more, before he entered the service of the defendant. The defendant, being engaged in the lumber business, operates a railroad extending from "Yellow Pine," in Webster parish, some seventeen miles into the woods from which it obtains its logs. On the morning of July 7, 1900, a train, consisting of eight or ten skeleton cars, used for the transportation of logs, a coal car and an engine, with tender, was started from Yellow Pine, with McClurken as engineer, and Doogan as fireman, on the engine, and the plaintiff as brakeman, whilst Matthews, the superintendent of the road, and two other men, Buckner and Moody, were riding on the tender. The train moved out in inverse order, that is to say, the log cars were ahead, the coal car was behind them, then the tender, and, lastly, the engine, backing and pushing the other cars. In this situation, plaintiff's position, when not otherwise employed, was on the foremost log car. A log car, it may be stated, consists of two trucks, of four wheels each, connected together by two timbers, about six by eight inches square, running fore and aft on top of them, and projecting out in front and rear, between the ends of which, as we understand it, are the "drawheads." Across the trucks, and extending out upon either side of the track, are large, squared timbers, called "bunkers," which serve to support the logs, and, from the end of one bunker to that of the other, upon each side of this skeleton car, is a pole, from about the middle of which is fastened a chain, called a "toggle." These chains, when passed over the logs with which the car is loaded, and connected together, serve to hold the load of logs in place. When the train in question had progressed about two miles, Matthews observed that one of the toggles was dragging on the ground, and there was a halt, and the plaintiff was signalled to secure it in position. In order to do this he dismounted from his place upon the forward car and went back to the car to which the toggle was attached, and, after he had fastened it properly, got on the train again at that point, signalling, either just before, or just after, getting on, or, perhaps, before and after, for the train to move on, and, as the train acquired headway, he proceeded forward to his position, and was in the act of taking his seat upon the forward "bunker," of the forward car, when, as he claims, the engineer, without warning of any kind,

reversed his engine and thereby caused the "slack," resulting from the pushing of the train, to be drawn out from between the cars, successively, so that, when the reverse movement reached the car that he was on it produced a jerk, or snap, illustrated by the popping of the cracker of a whip, which, being entirely unexpected, precipitated him in front of the moving train, with the result, that his leg was crushed and amputated as alleged in the petition. Doogan, the fireman, testifies that the engine was reversed, exactly as the plaintiff claims that it was, as may be seen from the following excerpt: "Q. What called your attention to anything unusual about the train? A. A kind of motion by the engine being reversed. Q. Had there been any signal given notifying anybody that the engine would be reversed, A. Not that I seen, or heard of. Q. Where was Mr. Matthews at that time? A. He was on the engineer's side on that corner of the tank. Q. When you noticed this reversal, did you look at the engine to see what the trouble was? A. Yes, sir, I raised up and looked at the engineer, to see what he was stopping for. Q. What did you notice, what was the condition of the lever? A. He had his lever reversed, for going back the other way. Q. How long after that before you found out that Mr. Bell was hurt? A. Right immediately. Q. How did you find it out? A. Mr. Matthews hallooed to me to set up the brake, quick, that Bell was under the train. Q. That was after you saw the reversal? A. Yes, sir." White, a bridge foreman in the employ of the defendant, who was standing alongside of the train, testifies that as the cars passed him, after the plaintiff had secured the toggle, he called to the plaintiff to look out for a hand car, which, it seems, he had sent farther along the road, after which, he says (quoting his language): "I noticed that the slack was taken up in the train and I looked about for him, and, as I looked, I saw him pitch headforemost off the car," etc. Matthews had been riding on a "supply box," being a compartment of the tender, upon the side nearest the cab of the engine, with his back to the engineer and his face in the direction in which the train was moving. He says: "I noticed the toggle chain dragging the ground and I had the train to stop and Mr. Bell got off and fixed it up, and, after doing so, the train started, and Mr. Bell went over toward the last car, and the last I saw of him he was in the act of taking his seat on the bunker. About that time I saw Mr. White, and I motioned to give him an order, and, then, I noticed that Mr. Bell was missing, and I gave the signal to stop. * * * Q. State

when the engine was reversed as compared with your signal? A. Well, it was reversed just as soon as the engineer saw my signal. I was in the act of crosisng the tank to speak to this man White when the signal was given." Buckner and Moody were riding on the rear end of the tender, the part most remote from the cab of the engine, with their faces in the direction in which the train was moving and their backs to the engineer. They testify that they saw Bell "pitch," or fall, forward, as he was in the act of taking his seat, but that they perceived nothing unusual in the motion of the train to produce that effect. They both testify, also, that they are not railroad men, and Buckner states that he has not had enough experience to know what the movements are or how an engine is reversed, and Moody, we infer, is not much better informed. McClurken, the engineer, testifies that he did not reverse the engine until he received a signal from Matthews to stop. He also testifies that, according to his recollection, White, as well as Matthews, and one or two others, were on the tender, and that Matthews crossed over to speak to some one on the side of the road.

The evidence shows that McClurken had been employed by the defendant, for several months before the accident, as a steam and water fitter and machinist, but, up to the day of the accident, had never been placed in charge of a locomotive. It further shows that, whilst he claimed to have been a locomotive engineer, and, at one time, a member of that brotherhood, and to have been so employed seven years before, he brought to the defendant no certificate to that effect, or clearance card, and that none were demanded of him, though such credentials are usually demanded by railroad companies employing engineers; and, it does not show that any inquiry was made as to his competency to discharge the duty to which he was assigned. That he was incompetent, is abundantly shown. He did not know how to use the injector upon the engine, and admits that he was obliged to call upon the fireman to instruct him in that respect, and the fireman was called upon to take the engine, with the injured plaintiff on board, back to Yellow Pine immediately after the accident. Later in the day, the engineer was given a further trial, and the fireman was obliged to intervene to keep the engine from running away, and, from that day forth, the engineer was never again placed in charge of an engine, by the defendant, and remained in its service but a few months longer. It is proper, also, to say in this connection that it does not appear that any witness in the

case had ever seen McClurken attempt to handle an engine until the day of the accident and that the plaintiff made the following statement in his testimony, to-wit: "As far as McClurken's ability as a machinist is concerned, I know nothing about that at all, but, as for handling an engine, I had a little switching with him that morning and I know, positive, that he was not competent to handle an engine." It should, further, be stated that, apart from the presence of Matthews, the superintendent of the road, the engineer controlled the train, as a conductor might have done, but that, the superintendent, being present, his was recognized as the paramount authority.

## Opinion.

In order to entitle the plaintiff, in a case of this character, to recover, it is as necessary for him to allege, and prove, that the injury of which he complains was caused by the fault of the person upon whom he seeks to impose the liability as for him to allege, and prove, the injury itself. In this particular case the allegation of injury is specific enough, and the cause of the injury is alleged to have been the incompetency of the engineer and the improper handling of the locomotive resulting from that incompetency. As to the engineer, therefore, the allegation of fault, as the cause of the injury, is as specific as the allegation of injury. But, the engineer is not the defendant in the case, and it is only upon the assumption that his incompetency and negligence are to be considered the incompetency and negligence of the defendant, his employer, that we can find any fault imputed to the defendant. Whilst, however, the doctrine of the non-liability of the master for injuries sustained by a servant in his employ, through the incompetency or negligence of another servant employed by him, has not been recognized in this state as including certain classes of cases to which it has been applied by the English, and by, some, American, courts, the case stated in the petition; i. e., the ordinary case of a brakeman injured through the fault of an engineer, when both are engaged in the handling of the same train, in the service of the same employer, is one to which, under our jurisprudence, as well as the jurisprudence elsewhere, that doctrine is properly applicable. Hubgh vs. N. O. & C. R. R. Co., 6 Ann. 495; Satterly vs. Morgan, 35 Ann. 1166; Town vs. R. R. Co., 37 Ann. 630; Wallis vs. R. R. & S. S. Co., 38 Ann. 160; Dandie vs. R. R. Co., 42 Ann. 689. Stating the doctrine thus referred to more specifically, for the

purposes of the instant case, it is, that an engineer and brakeman, employed by the same master and engaged in handling the same train, are fellow servants, each of whom, by virtue of his acceptance of such service, assumes the risks resulting from the incompetency or negligence of the other, and acquits the master from liability for the injury which he may sustain thereby; *provided,* the master has not employed, or retained, the incompetent, or negligent, one, knowing him to be incompetent. or negligent, or when, by the exercise of reasonable care, he might have informed himself as to such unfitness. It follows from this, that the incompetency, or negligence, of the engineer is not, *per se,* the incompetency or negligence of the defendant, and that the defendant was not, necessarily, at fault in having in its employ an incompetent engineer, since that condition might have existed notwithstanding the exercise, by the defendant, of all the care that the law requires; and, hence, it also follows, that the mere allegation, that the engineer was incompetent, and that through his incompetency the plaintiff was injured, imputes no fault to the defendant.

The general proposition, supported by the weight of authority, is thus stated: "In an action to recover for personal injuries to an employe, caused by the negligence or incompetence of a fellow servant, the complaint must allege negligence on the part of the master in employing such fellow servant, or in retaining him after his negligence or incompetency become known. A declaration merely alleging an injury sustained through the negligence of a fellow servant does not state a cause of action." Enc. Pl. & Pr., Vol. 13, pp. 899-900. "The general principle that the master is not liable for injury occasioned to a servant by the negligence of a fellow servant, in the absence of proof of fault or negligence in the employment or retention of the latter, may now be considered as firmly settled in Louisiana." Wallis vs. R. R. & S. S. Co., 38 Ann. 160. "Plaintiff cannot prove what he has not alleged." DeBuys vs. Farmer, 22 Ann. 479. "The principle that the *gravamen* is negligence, that is, the employment of an unfit servant, with knowledge, actual or constructive, of his unfitness * * * involves the corollary that a complaint is demurrable which merely alleges that it was the master's duty to employ careful and skillful servants, and that he failed to select those that were competent. A want of care and diligence should also be charged." Moss vs. Pacific R. R. Co., 49 Mo. 167. (Cited in notes to Smith vs. R. R. Co., 151 Mo. 397; 48 L. R. A. 398.)

If, therefore, the plaintiff in the case at bar had proved all that he alleges in his petition, and had been allowed to prove no more, he would not have been entitled to a judgment, since, whilst he alleges that the injury sustained by him resulted from the incompetency of the engineer, he does not allege that the defendant was guilty of negligence in employing, or retaining, the engineer. We think, therefore, that the exception of "no cause of action," if its decision had been insisted upon before trial on the merits, should have been sustained (Robbins vs. Martin, Jr., *et als.,* 43 Ann. 489), and that it was error for the trial judge to charge the jury that "the general allegation that the damage was caused by the employe is sufficient notice to the defendant that he knew of the incompetency of the employe." Upon the other hand, whilst it is true that the exception of "no cause of action" is not waived by going to trial on the merits, nevertheless, it may be rendered ineffective if the defendant, without objecting, permits the petition to be amended in such a manner as to supply the omission at which it is aimed; and so, if, upon the trial upon the merits, the defendant, without objecting, permits evidence to be introduced tending to establish facts, which, if alleged, would have disclosed a cause of action, he allows the ground upon which his exception is based to be taken from under it, since he, thereby, in effect, allows the petition to be amended and its defects cured.

"A party who, without opposition, suffers evidence to be adduced, contrary to, or beyond, the allegations contained in the pleadings, is bound by its effect, so that, after the admission of the evidence, it matters not if the judge should strike out that portion of the pleadings." Hennen vs. Gilman, 20 Ann. 241; Powell vs. Aiken & Gwynne *et als.,* 18 La. 328; England vs. Grison, 15 Ann. 304; New Orleans vs. Congregation, etc., 15 Ann. 389; Barbet vs. Roth, 16 Ann. 273; Godden vs. Executors, 35 Ann. 164; McCloughery vs. Finney, 37 Ann. 27. "If illegal evidence be admitted and a bill of exceptions taken thereto be not brought to the notice of the court the evidence will be considered." Draper vs. Richards, 20 Ann. 306.

We consider it unnecessary to add anything to what has been said in the preceding statement concerning the incompetency of the engineer, except to say that, whilst the defendant, through its counsel, insists that he was competent and that he was guilty of no fault in the matter

of the accident to the plaintiff, it seems to us significant that he was not permitted, after the accident, to take the engine back to Yellow Pine, a distance of about two miles, and that he was permanently relieved from duty, as engineer, so far as the defendant was concerned, upon the evening of the day upon which the accident occurred, although, as the evidence shows, a competent engineer was not, then, easy to find. Nor is it necessary that we should dwell upon the question of the care exercised by the defendant in selecting McClurken as its engineer, for, in truth, it cannot be said that any care was exercised. The record discloses no other authority than McClurken's own statement for the supposition that he had ever, until the day of the accident, attempted to run a locomotive, and it fails to show that the defendant made any inquiries as to his character or competency. He testifies that he had not before made such an attempt within seven years, and, although he states that he had been at one time a member of the "Brotherhood of Locomotive Engineers," he does not explain why, or when, he ceased to be a member of that organization, and he had no clearance card to support his statement that he had ever been a member, and he was accepted by the defendant and assigned to duty without being called on for a certificate or credentials of any description. Both reason and authority sustain the proposition that, where the service in which the servant is employed is such as to involve risk to the lives and persons of others, the master, upon engaging such servant, is required to make reasonable investigation into his character, skill and habits of life. 48 L. R. A. 376, note; 41 L. R. A. 82, note. In considering whether the inopportune reversing of the engine was the cause of the accident, we have regarded the testimony of Buckner and Moody as of little value. Not that we have any reason to suppose that they have not testified truthfully, according to their lights, but, because, being seated upon the rear end of the tender, with their backs to the cab of the engine, their faces turned in the direction in which the train was moving, and their attention attracted to what was going on in front (for they both testify that they were looking at Bell when he "pitched," or fell, forward, from the train), and because they were entirely unfamiliar with all phenomena connected with the handling of locomotives, it is not surprising that they did not see what the engineer, behind them, was doing, and that they did not, otherwise, recognize the fact that he had reversed his

engine, the more particularly as the effect of that movement was, neces-
sarily, much less pronounced and violent where they were than upon the
last, skeleton, car, at the other end of the train. As to the other wit-
nesses: Doogan, who appears to be disinterested, although not an old
railroad man, had had sufficient experience to enable him to recognize
the effect produced by the reversal of the engine upon which he was
working as fireman, and his testimony is clear, positive and unambigu-
ous, that the engine was reversed, without warning; that it attracted
his attention and that it preceded, and did not follow, the discovery
of the misfortune that befell the brakeman. White, also, appears to be
disinterested, and he testifies that, a moment after speaking to Bell, as
the cars moved past him, he saw the "slack" being taken out, and, evi-
dently realizing the effect that such a movement, advancing rapidly
towards the front car, would be likely to produce, he looked about for
Bell, and, as he looked, saw Bell "pitch head-foremost off the car."
To this we have added the testimony of Bell, himself, an experienced
railroad man, and the conceded facts, that the road was smooth, with
the grade slightly inclined upwards, and that the train was moving at
a rate not exceeding six or eight miles an hour. Upon the other hand,
we have the testimony of the superintendent of the road (who, immedi-
ately afterwards, placed the fireman in charge of the engine, and, that
night, summarily, discharged the engineer) to the effect that the engine
was not reversed until after Bell had been thrown, or had fallen, off,
and of the engineer to the same effect. It is a fact admitted by both of
these witnesses, however, that, before Bell had fallen off, the superin-
tendent had moved from his position on the supply box and had indi-
cated, in a manner that was understood by the engineer, that he in-
tended to speak to the man (White) whom they were approaching, and
who was standing by the side of the road. Under these circumstances,
it seems to us not unlikely that the engine was hurriedly reversed,
whether in response to a signal given by Matthews or not, in order to
enable him to accomplish his purpose. But, whether it was reversed for
that, or for some other, reason, the jury, who saw and heard the wit-
nesses, evidently believed that the reversal of the engine was the cause
of the accident, and we are of the same opinion. It is said, however,
that Bell knew of the incompetency of the engineer before entering into
fellow service with him, and, hence, must be held to have assumed the
risk incident thereto. It is no doubt true, generally speaking, that a

servant who is aware of the incompetency of a fellow servant and who, nevertheless, voluntarily, enters into fellow service with him, assumes the risk incident to such incompetency. But, in this particular case, it will be remembered that Bell's conclusion as to McClurken's incompetency was based upon a limited "switching" experience upon the very morning of the accident and had, therefore, scarcely a sufficient basis to justify a serious conviction that it would be unsafe to go out on the road with him. Beyond this, Bell knew that McClurken was going out for the first time and that the superintendent of the road was going, on the engine, or tender, with him, and, we think he might fairly have presumed that the purpose of the superintendent was to protect the property and employes of the road from the inexperience and, possible, incompetency of an engineer who was untried and, so far as his competency was concerned, was unknown. It may be said that the defendant, through its superintendent, was, itself, present on the engine, and that the fault committed by the engineer, having been committed in its presence, was committed by it, and not by the fellow servant of the plaintiff. There is no doubt that the engineer was acting directly under the instructions of the superintendent. It was by the order of that officer that the train had been stopped in order that the "toggle" might be picked up; and, according to his testimony, it was by his order that it was stopped, a few moments later, that assistance might be rendered to Bell. He was so near to the engineer that his orders were communicated by word of mouth, or by visible signs, and, being so near, was in a position to see that his orders were so executed as not to endanger the lives of others, and the responsibility rested on him to see that they were so executed. Equally, we think, did the responsibility rest upon him, considering the circumstances of the case, to see that the duties of the engineer, whether discharged under specific orders from him, or otherwise, were properly discharged, since the defendant, of which he was the representative, had seen proper to assign to the discharge of those duties a person concerning whose competency it was ignorant and had made no inquiry, but whose incompetency to handle a train the superintendent had been afforded a better opportunity to find out, during the run from Yellow Pine to the place of the accident, than had ever been afforded to the brakeman.

The evidence shows that Bell was earning from $1.75 to $2.20 a day at the time of the accident; that his leg was crushed, practically, off,.

and was subsequently amputated, and reamputated, and that, whilst it was not entirely sound at the date of the trial, he was, nevertheless, at that time, enabled to earn, in some way, an average of about $7.00 a week. After the verdict and judgment in his favor, he died, and his widow and minor children have been made parties to the appeal. The verdict of $10,000 is rather larger than this court has been in the habit of affirming in similar cases, and we think should be reduced. It is, therefore, ordered, adjudged and decreed that the amount allowed by the judgment appealed from be reduced from $10,000 to $6000, and that, as thus amended, said judgment be affirmed, in favor of Mrs. Lillian Bell, as widow of the original plaintiff, and as natural tutrix of the minor children, Gertrude, Lillian, Harvey and Charley Bell, issue of her marriage with said original plaintiff, now deceased. It is further ordered, adjudged and decreed that the costs of the appeal be paid by the appellees, and those of the district court by the defendant.

