(52 South. 167.)

No. 17,820.

WILLIAMS v. W. R. PICKERING LUMBER CO. et al.

(March 14, 1910. Rehearing Denied April 25, 1910.)

(Syllabus by the Court.)

1. MASTER AND SERVANT (§ 289*)—INJURY TO SERVANT — NEGLIGENCE — QUESTION FOR JURY.

Where plaintiff, a brakeman riding on a skeleton car of a logging train, was thrown beneath the wheels and badly injured, by the sudden and violent stopping of the train by the engineer, without warning or notice, the question whether he was guilty of contributory negligence in riding in an unsafe position on the car is one of fact, peculiarly within the province of the jury, and after a review of the evidence we are not prepared to say that the finding is against the preponderance of the evidence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1124; Dec. Dig. § 289.*]

2. MASTER AND SERVANT (§ 240*)—INJURIES TO SERVANT — NEGLIGENCE — UNFORESEEN ACTS.

Plaintiff cannot be considered as guilty of contributory negligence for failing to foresee and guard against a sudden and unexpected emergency stop, which no one anticipated.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 754; Dec. Dig. § 240.*]

3. MASTER AND SERVANT (§§ 198, 226, 216*)— ASSUMPTION OF RISK—NEGLIGENCE OF MASTER AND SUPERINTENDENT.

Plaintiff cannot be considered as assuming the risk of the negligence of the railroad company or of its conductors, or engineers acting as conductors.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 501–505, 570; Dec. Dig. §§ 198, 226, 216.*]

4. MASTER AND SERVANT (§ 240*) — NEGLIGENCE OF SERVANT—ASSUMING DANGEROUS POSITION.

As the evidence tends to show that the position of the brakeman on the car would have been safe under ordinary circumstances, he cannot be considered as guilty of contributory negligence for assuming such a position.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 752; Dec. Dig. § 240.*]

5. MASTER AND SERVANT (§§ 137, 141*)—INJURIES TO SERVANT—NEGLIGENCE OF MASTER.

The emergency stop was the immediate cause of the injury, but the necessity for such a stop was created by the negligence of the superior servants of the railroad company in leaving the switch open, contrary to custom, and in not inspecting the switch before attempting to use it, and by the negligence of the management in not making and enforcing proper rules for the operation of the switch.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. §§ 137, 141.*]

6. MASTER AND SERVANT (§§ 137, 141*)—INJURIES TO SERVANT—NEGLIGENCE OF MASTER.

But from any point of view, the efficient cause, the causa causans, was the negligence of the company and of its servants for whose fault it is answerable.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. §§ 137, 141.*]

7. DAMAGES (§ 132*)—PERSONAL INJURIES—EXCESSIVE AMOUNT.

As far as possible, some reasonable uniformity in awards of damages should be observed.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 381; Dec. Dig. § 132.*]

Monroe, J., dissenting.

Appeal from Twelfth Judicial District Court, Parish of Vernon; Don E. So Relle, Judge.

Action by Claude Williams against the W. R. Pickering Lumber Company and others. Judgment for plaintiff, and defendants appeal. Modified and affirmed.

Palmer & Williamson, for appellants. Blanchard, Barrett & Smith and Monk & Kay, for appellee.

LAND, J. Plaintiff sued for damages in the sum of $20,078 for personal injuries sustained by him while working as brakeman on the Louisiana Central Railroad. The W. R. Pickering Lumber Company and the Pickering Land & Timber Company were made codefendants on the allegations of common connection, co-operation, and privity of interest.

The petition alleged, in substance, that the plaintiff was employed and commenced work on March 10, 1908, as brakeman on the log train of the railroad operating in the vicinity of Cravens, for the purpose of logging the mill at that place.

That on the next day that plaintiff, while in the discharge of his duties as brakeman, was thrown from the last of 18 skeleton log cars, by the sudden stopping of the locomotive by the engineer on the "pond track," at or near a connecting switch on the main line of the defendant railroad; and, in consequence, plaintiff was terribly injured, losing an arm and a leg, and sustaining other painful wounds.

That the conductor of a train on the said main line carelessly and negligently left said switch open at the point of connection with the "pond track."

That the engineer of the log train moving carelessly out of the "pond track," when very near said open switch, without notice or warning, reversed his engine, and caused a sudden stoppage of the locomotive, whereby the slack between the cars was taken up with a mighty jolt or lurch, and in consequence the plaintiff was pitched headlong down under the car.

That defendants were negligent in not furnishing safe places to work and to ride, safe appliances, air brakes or other sufficient brakes, a proper switch, suitable equipments, and did not exercise due care and diligence in the manner the trains were operated by those placed in charge.

Defendants pleaded the general issue; that if the plaintiff was injured as alleged the injury was occasioned by his own gross negligence; that the risk, such as might have existed, was apparent, and was accepted by the plaintiff when he entered defendant's employ; and that the injury, if caused in the manner alleged, was occasioned by the negligence of the plaintiff's fellow servants.

After a very protracted trial before the court and jury, there was a verdict in favor of the plaintiff for the full amount claimed. The defendants have appealed.

A record of nearly 1000 pages attests the zeal and industry of counsel. The evidence is so voluminous and conflicting that it is impossible to condense even its substance within the limits of an ordinary opinion.

The Louisiana Railroad Company, as a common carrier, operates its main line from Pickering to Cravens, a distance of about 19 miles. The W. R. Pickering Lumber Company has its plant at Pickering, and that of the Pickering Land & Timber Company is located at Cravens. A regular train for passengers and freight is operated once a day on the main line, which is also used by a number of logging trains in the transportation of logs to the two mills. At the mill near Cravens there is a large pond for the reception and handling of logs. A track leading from the pond to the main line, several hundred yards distant, is called the "pond track." A logging train going out to the woods follows this track to the main line, is switched thereon, and then takes the main line until the woods track is reached. The logging train at Cravens usually made three or four trips per working day. Hence the switch on the main line near the mill pond was used by the logging train three or four times as often as it was used by the regular train. This being so, it was customary to keep the switch lined up with the "pond track" in order to save time in the operation of the more important branch of the business.

The railroad company had a local superintendent at Cravens, who at the same time superintended the mill there operated. The railroad company had no written or printed rules for the guidance of its employés. The logging train was run by a man named Benner, who was both engineer and foreman or conductor. In the running of the train Benner was aided by a fireman and two brakemen. Plaintiff was one of the brakemen.

On March 11, 1908, after making one trip to the woods, Benner gathered up 18 empty skeleton cars on the "pond track," and pull-

ed out for the switch. When within about 90 feet of the switch, Benner saw that the switch points were open or against his train, and immediately reversed his engine, and succeeded in stopping the locomotive on the points of the switch. Benner gave no signal warning to his crew before reversing this engine, but made an emergency stop as in case of sudden danger. Benner handed in a report blaming the crew of the regular train for leaving the switch open. Benner, an experienced engineer, supposed that the crew of the regular train had performed the customary duty of closing the switch. The switch was a ground switch, and Benner could not tell from its position whether it was open or closed. Benner testified that on one or more occasions he had run his locomotive into the same switch. We gather from the testimony of several other witnesses that it was the duty of the crew of the regular train to close this switch. The local superintendent did not testify on this subject. Benner seems to have had full control and management of his logging train. None of the crew of the regular train testified in the case. The matter of the closing or opening of this switch seems to have been left to the crews of the two trains. According to Benner and his fireman, sometimes the crew of the regular train passed and left the switch open. If this be true, it was negligence in Benner not to send one of his crew ahead of the train to inspect the switch every time he had occasion to use it.

The superintendent was negligent in not making and enforcing proper rules and regulations for the safe operation of this switch. After the accident a rule was adopted making it the special duty of the conductor or engineer in charge of the regular train to see that this switch was not left open or against the "pond track."

Under the conditions existing on March 11, 1908, Benner, knowing that the switch might have been left open by the crew of the regular train, and knowing that the switch had no sufficient warning signal device, was guilty of negligence in not sending one of his crew forward to inspect and close the switch if necessary. The engineer was also guilty of negligence in reversing the engine without warning. See Bell v. Lumber Co., 107 La. 725, 31 South. 994. Benner, having sole charge of the operation of the logging train, represented the railroad company, and was not a fellow servant of the brakeman; nor were the crews of the two trains fellow servants. Weaver Case, 116 La. 468, 40 South. 798; Town's Case, 37 La. Ann. 630, 55 Am. Rep. 508; Mattise Case, 46 La. Ann. 1535, 16 South. 400, 49 Am. St. Rep. 356; Payne's Case, 117 La. 983, 42 South. 475; Dobson's Case, 52 La. Ann. 1134, 27 South. 670. If the superintendent of the defendant company was negligent, the fellow servant doctrine has no application. Ferringer v. Oil & Mineral Co., 122 La. 441, 47 South. 763.

Benner did not give the customary sudden stop signal to his crew, but, according to his report, it was a case of emergency, and he reversed the engine to save the open switch. According to Benner's testimony and report, he did not take the safety of the crew into consideration. Nor do we find in the record any evidence tending to show that the railroad company ever instructed or warned the crew as to the proper precautions to be taken to avoid the constant dangers attending the operation of the logging trains. The crews were left to their own devices to safeguard themselves not only against the ordinary, but the extraordinary, hazards of an occupation, dangerous even under the best conditions.

The emergency stop in question caused great excitement and commotion. As the cars began to bump together, cries of "Look out!" "Look out!" were heard. At this mo-

ment the plaintiff was standing on the rear portion of the last car of the train. This particular car was jerked violently forward, and the plaintiff was hurled head foremost beneath the car. He was run over and injured in the manner already stated. The rear trucks of the car left the rails. Whether this derailment was caused by the sudden stopping of the locomotive, or by its running over the leg or arm of the plaintiff, is one of the disputed, but not essential, issues of fact in the case.

The answer does not even hypothetically admit that the railroad company or any of its representatives was guilty of negligence. Hence, technically, the averments of the answer do not raise the question of contributory negligence. This issue, however, was presented by the evidence, and was considered by the jury under the charge of the court.

On this issue the burden of proof rests on the defendant railroad company. Buechner v. City of New Orleans, 112 La. 599, 36 South. 603, 66 L. R. A. 334, 104 Am. St. Rep. 455.

On the day of the accident, the plaintiff was acting as rear brakeman and flagman. His proper place was on the rear car. His duty was to watch the cars, and to flag the engineer if anything went wrong. As a matter of fact, on that occasion, the rear car was not properly coupled, and the plaintiff flagged the engineer, who thereupon stopped the train, and backed to make the required coupling. This was done, and the train proceeded toward the switch on the main track.

It is defendant's contention that thereupon the plaintiff got on the rear car, and was standing erect in the most dangerous position that could be assumed when the emergency stop was made, and therefore was guilty of contributory negligence.

It is plaintiff's contention, on the other hand, that he was not standing in that po-

sition, but in a much safer one, and would not have been injured except for the emergency stop made without notice or warning to him.

Before considering the testimony on this issue, it is necessary to briefly indicate the make-up of the skeleton logging car in question. Such a car may be described in general terms as an open framework of heavy timbers resting on very low trucks. The main component parts are two reaches or stringers extending lengthways through the center of the car, and from 8 to 12 inches apart. These stringers are longer than the body of the car, and project in the front and rear so as to be used as parts of the coupling device. The sidebar is a piece of timber on each side of the car. The bunk is a large piece of timber that extends across the car at each end, for the purpose of holding the longer logs. The false bunk, of the same nature, is intended to hold the shorter logs. The oil box is a covered metal receptacle for oil waste on the outside of the trucks. This box has a groove on the top sufficiently wide to afford a footing for brakemen.

The proper way for the rear brakeman to mount the rear car is to put one foot on the oil box, his hands on the bunk, and then to place the other foot on the stringer. Plaintiff testified that he got on the car in this manner, and remained in this position with both hands braced against the bunk until he was thrown forward by the sudden and unexpected stop of the train.

Buford, the other brakeman, went to Texas after the accident, and his deposition was taken in behalf of the defendant. From his answers it is impossible to tell how the plaintiff was standing. The tenth answer is that plaintiff "was standing with one foot on the stringer and the other on the box." Again asked to describe the position of the plaintiff, the witness made the same answer by reference to his first answer. In a sub-

sequent answer the witness stated that plaintiff "had just been on the bunk half a moment," and in his last answer described plaintiff as "standing perfectly straight with one foot on the bunk and the other on the stringer of the car." The answers of this witness were so unsatisfactory to the defendants that they induced Buford to attend the trial and give his testimony before the jury. Buford explained that his answers had not been correctly taken down by the officer in Texas. On the trial Buford testified that the plaintiff was standing erect with one foot on the stringer and one on the bunk at the moment of the accident.

C. B. Smith, an employé of the defendant, testified that on the night of the accident or the next night Buford told him that the plaintiff was standing with one foot on the oil box, the other on the stringer, and was leaning over with his hands on the bunk. An attempt was made to impeach Smith by showing that he made contradictory statements about the declarations made to him by Buford. A colored witness who supported Buford's version was successfully impeached by proof of contradictory statements. Besides, this witness was flatly contradicted on another point by the local superintendent of the defendant.

On the other hand, plaintiff's version is sustained throughout by the testimony of a colored man who was with defendant's colored witness, and is corroborated to some extent by Embry, a reputable witness, who attracted by the noise and shouting, looked out of the window and saw a man standing behind the bunk of the rear car with his hands extended just before the lurch. This witness could not say that plaintiff's hands were resting on anything or state the position of the feet, as he saw him just a moment. He testified that the car bounced a few times, and plaintiff went over the side. It is significant that the local superintend-

ent who described the position of Buford, the head brakeman, at the time of the accident, did not testify as to the position of the plaintiff, the rear brakeman, who was nearer to the witness.

Considering this evidence as a whole, we cannot say that the preponderance is against plaintiff's version of his position at the moment of the accident. The deposition of E. K. Kehoe directly sustaining the testimony of the plaintiff on this point was ruled out on the technical objection that the notary had not *sealed* the envelope containing the deposition transmitted by mail to the clerk of the court. This objection was sustained although the notary appeared in court and testified that the deposition had not been tampered with in any respect. The additional objection that the witness was not duly sworn was also sustained. We do not, however, consider that the exigencies of this case make it necessary for us to pass on the exclusion of this deposition.

Accepting as true the plaintiff's version of his position at the time of the accident, the next question is whether the assumption of such a position was contributory negligence under all the facts and circumstances of the case. A jury of the vicinage, doubtless familiar with the usual operation of logging trains, after hearing the evidence and inspecting similar skeleton cars, reached the conclusion that the plaintiff was not guilty of contributory negligence. What a prudent brakeman should or should not do under given circumstances is a question peculiarly within the province of the jury. See Thompson's Commentaries on the Law of Negligence (Revised) vol. 5, §§ 5617, 5626. In one of the cases cited by said writer, a brakeman was riding on a flat car between two tiers of logs, and in another a brakeman was sitting on the rear bolster of a skeleton car, and attempting to light a cigarette, instead of being at his post as brakeman.

The same writer states the tests by which to determine whether there has been a want of ordinary care, as follows, viz.:

"It must here be remembered that what is termed ordinary care is not an absolute, but a varying, circumstance, depending upon the existence of each particular case, always proportionate to the risk to be avoided. The test of contributory negligence or want of due care is not always found in the failure to exercise the best judgment, or to use the wisest precaution. Some allowance may be made for the influences which ordinarily govern human action, and what would under some circumstances be want of reasonable care might not be such in others; but it is to consider whether a prudent person, in the same position and having the knowledge possessed by the one in question, would do the negligent act. * * * On the other hand, an instruction that the plaintiff must be *entirely free from any negligence that helped to bring about the accident,* in order to recover, is erroneous, because it exacts of the plaintiff a higher degree of diligence than the law requires. It is said in another case that contributory negligence is not imputable to a person for failing to look for danger, when under the surrounding circumstances, the person sought to be charged with it had no reason to suspect that danger was to be apprehended." Id. vol. 1, § 173.

In the case at bar the plaintiff had no reason to apprehend that the crew of the regular train would negligently leave the switch open or against the "pond train," and that the engineer of the latter train, confronted unexpectedly with the danger of running into the open switch, would make an emergency stop, without notice or warning. If the plaintiff had been injured by one of the ordinary dangers accompanying the operation of logging trains, the question would be different. But it is going too far to say that the plaintiff should have anticipated the negligent conduct of the servants in charge of both trains.

It is shown by the evidence, and indeed is not seriously disputed, that plaintiff's position on the rear car would have been a safe one for the short run between the pond and the switch if the emergency stop had not been made. There was no apparent danger of any accident to the train in running that distance. The danger that did arise was not anticipated by the experienced engineer in charge of the train, or by the local superintendent then present, or by any member of the crew. To hold that plaintiff was guilty of contributory negligence would be tantamount to the declaration that every trainman is bound to anticipate all possible dangers and to take all possible precautions against them.

There is an immense mass of expert testimony as to the safest manner of riding on skeleton cars. As usual, the experts differ. They agree that riding standing without brace or support is the most dangerous mode. One suggests that the safest way is to sit on a sidebar, and hold on the bunk with the feet. Others advocate sitting on the stringers and holding on with both hands. It is not explained how a rear brakeman, sitting down as suggested, could very well watch the train, and flag the engineer in case of emergency. The truth seems to be that there is no safe position for a brakeman on a skeleton car. In the case at bar, the car had no flooring and no handholds or other safety devices. It is bad enough to subject brakemen to the usual hazards of life and limb attendant on their rough and dangerous occupation. To hold, further, that the brakeman must at his peril anticipate and guard against the negligence of others would be contrary to established principles of law as well as the dictates of justice and humanity.

In the light of the surrounding circumstances as they appeared to the plaintiff at the time, his position was a reasonably safe one, and the evidence shows that a great many brakemen ride that way. We agree with the jury that there was no contributory negligence.

The last contention that the plaintiff assumed the risk of the injury is unfounded. In McGinn v. McCormick, 109 La. 396, 33 South. 382, the court held that an injured servant is not to be considered as having as-

sumed the risk of injury to be incurred from the negligence of the master or from the negligence of the master combined with that of a fellow servant. See also, Moses v. Grant Lumber Co., 114 La. 933, 38 South. 684. It is equally well settled that the servant does not assume the risk of injury from the negligence of those for whose conduct the master is responsible, or of those not in law his fellow servants. Thompson, supra, vol. 4, §§ 4618, 4619. In this state, a conductor, or an engineer performing the duties of a conductor, is not a fellow servant of a brakeman on the same train, nor are the servants on one train the fellow servants of a brakeman on another train operated by the same company. Under the facts of this case, the injury of the plaintiff was occasioned by the combined negligence of the defendant railroad corporation and its conductors, or engineers acting as such.

The evidence shows that the W. R. Pickering Lumber Company and the Pickering Land & Timber Company are separate and distinct corporations, and have a traffic agreement with the Louisiana Central Railroad Company. It therefore follows that the judgment must be reversed as to the two first-named corporations.

We think that the verdict is excessive in amount. While there is no standard for the measure of damages in the case of a loss of one or more limbs, some reasonable uniformity in the awards in like cases should be observed. The loss of earning capacity is an important factor in many cases. The following Louisiana cases have been cited by counsel for the plaintiff: Barksdull v. R. R. Co., 23 La. Ann. 180 (where a boy lost both legs, and the award was $15,000); Choppin v. R. R. Co., 17 La. Ann. 19 (where a young man lost his leg, endured long months of physical suffering, and was deprived of his employment—nature not stated—there was an award

of $25,000); Ketchum v. R. R. Co., 38 La. Ann. 777 (where a verdict for $10,000 for the loss of an arm was affirmed); Nelson v. R. R. Co., 49 La. Ann. 491, 21 South. 635 (where a child lost both legs, a verdict for $30,000 was reduced to $20,000).

In Black v. R. R. Co., 125 La. 101, 51 South. 82, plaintiff, who had previously lost all the fingers of his right hand, except the thumb and a twisted little finger, was run over by a locomotive and lost his left arm at the shoulder, a part of one ear, and was injured in the face and more seriously in the back, and as a result was rendered unable to perform any physical labor, a verdict of $17,000 was affirmed, without discussion of the question of quantum.

On the other hand, the counsel for defendant cite cases where verdicts of from $2,000 to $6,000 for the loss of a limb have been affirmed. We freely admit that the cases cited cannot be reconciled, and that there are no rules of law on the subject-matter. But a person who has lost both arms or both legs is in a worse position than a person who has lost one arm and one leg, and is entitled to greater damages for the maiming. Hence, the plaintiff in this case should receive less damages than a person who has lost both limbs.

We are of opinion that the verdict and judgment should be reduced to $12,000.

It is therefore ordered that the verdict and judgment below be amended by reducing the amount thereof to the sum of $12,000, and by dismissing plaintiff's suit against the W. R. Pickering Lumber Company and the Pickering Land & Timber Company, with costs occasioned by their joinder in this suit, and it is further ordered that, as thus amended, the said verdict and judgment be affirmed, and that the plaintiff pay the costs of appeal.

MONROE, J., dissents.