Statement of the Case.
MONROE, C. J.
"Defendant has appealed from a judgment awarding plaintiff $4,000 as damages for personal injuries sustained by him whilst in defendant’s employ and resulting from an accident which he attributes to defendant’s negligence. Defendant denies liability, and alleges that the proximate cause of the accident was the negligence of plaintiff, or of a fellow servant, and that plaintiff had assumed the risk of the same as incidental to his employment. It appears from the evidence that plaintiff, an able-bodied man, 52 years of age, was employed by defendant as a carpenter at $1.75 a day, and was engaged, under a foreman named Brian and an assistant foreman named Wright in bridge work, about two miles above Colfax, In the parish of Grant; that the working gang had their sleeping and eating quarters in a car which was stationed some five miles, or more, below the bridge upon which they were working; that they were conveyed between the two points upon a motorcar furnished by defendant for that purpose, and on the occasion of the accident, having been to dinner, were returning to work with Wright in charge of the car, and Dupuis, a member of the gang, who several months before had been assigned to that duty, operating it, and that when within the limits of the Colfax railway yards, the motor ran into an open switch, was derailed and overturned, and plaintiff sustained the injuries of which he complains.
It further appears that there are three lumber companies which receive empty cars from the Colfax Station, at which station also cars loaded by them are made up into trains, and that the required switching is done every day with the exception of Sundays, the custom being to begin by delivering “empties” to, and bringing out loaded cars from, the Hardwood Mill, which lies farthest to the north; then performing the same service to the Big Pine Mill, which is situated about three-quarters of a mile above the freight depot, and between the depot and the Hardwood Mill, after which cars are delivered to and received from the latt Mill, which is south of Colfax. In the neighborhood of the depot there are the main track and two side tracks, and, in making up the trains, the loaded north-bound cars are placed upon one of the side tracks and the *141 loaded south-bound cars upon the other. Deloach, the conductor and yardmaster, who was in charge of the switching operations, testifies, as we understand him, that the main line is required to be kept clear for first and second class trains, which, he says, include passenger and through freight trains, but that irregular trains, including the local freight, and also the motorcar of the working gang, “must come into yard limits expecting to find the main line obstructed; * *. •’ must be under control; * * * prepared to stop.” He further testifies that, at the time of the accident, which was about 2 o’clock p. ru., there was no regular train to be protected, or guarded against, as one of the daily passenger trains had passed in the morning, and the other was not due until 2:40 o’clock p. m. (he does not, however, mention the through freight in that connection); that his crew had furnished the switching for the Hardwood Mill, had brought out the loaded cars from the Big Pine Mill, placed them on the main track, above the switch leading into that mill, had delivered the empties upon the mill premises, and was bringing the engine out of those premises, with a view of coupling it to the loaded cars and bringing them down and placing on the side tracks, when the accident occurred, and that they were at the place of the accident, shoving cars into the side track not over eight minutes after that occurrence; that he himself had opened the switch in question, and had gone into the office at the freight depot to transact some business with the agent, and was coming out when the accident occurred. It is quite evident, however, that he was not in a very good position, after going into the office, to know what was being done by tbe switch engine in or about the premises of the Big Pine Company, which were three-quarters of a mile, or more to the northward, and, being upon which, the engine was not visible from the freight depot. The preponderance of the testimony is to the effect that, at the time of the accident, neither engine nor cars were in sight from the depot; and that the witness was mistaken in saying that the loaded cars from the mill had, at that time, been placed on the main track; and we think it quite likely that he was mistaken in his estimate of the time that elapsed between his opening of the switch and the accident. He admits that the switch was left open for probably 20 minutes all together, and it otherwise appears that that was at a time when it was customary for the motorcar to pass, carrying the workmen back to the bridge. Tbe witness further testifies, on his examination in chief, to the effect that he had familiarized himself with the rules of the ‘defendant company, and as to his understanding of them, and as follows:
“Q. Under these rules, did your switching crew owe any duty to protect against third class trains, and motors, and such as that? A. No, sir ; they did not.”
On cross-examination:
“Were you governed by standard rules in the operations of your trains? A. Yes, sir; of this switch engine; yes, sir. * * * Q. You say that you worked for the Iron Mountain and the Southern Pacific? A. Yes, sir. * * * Q. What is the Iron Mountain rule as to a crew on the main line, switching; what is their rule as to that, their general rule? A. Their general rule is that they must be left in the proper position, after having been used, the conductor being responsible for the switching. * * * Q. Is it not a fact that you did leave this switch, where the accident happened, take the main line for a distance of half a mile, throw open another switch, and go into another siding, off the main line? A. Yes, sir; that is true. * * * Q. Did you leave any flagman at this switch? A. No, sir; I did not. * * * Q. You left that switch open? A. Yes, sir; I have testified to that; the switch was left open, I expect, for about 20 minutes, when I went into the office. Q. Does your rule No. 104 say that ‘Main track switches must be kept locked when not in use’? A. Yes, sir; after the switch has been used, it must be put back in proper position; it must be left in proper position after having been used. Q. Did you not say that you came in on that loaded track and got these cars and carried them to the house track? A. Yes, sir; that is what I said. Q. You had used that switch? *143 A. Yes, sir; I had used that switch. Q. Where the accident happened — you had used that switch where the accident happened? A. Yes, sir; I had. Q. And backed up one-half a mile away to deliver the cars that you got off of that switch? A. I had gone up. Q. You left the switch open? A. No, sir; I came and opened it. * * ;í Q. Then your contention is that you did lock that switch? A. No, sir; that is not my contention; if I was working in this yard from 6 a. m. to 6 p. m. I would not lock that switch; if I was loading a passing train, I would, certainly. * * * Q. You- cannot contend that you can use two switches at once, can you? A. Yes, sir; you can use two or three at once. Q. Do you state that you were using two or three that day? A. Yes, sir; I had used every switch in the yard that day, several times. Q. But, at the time- of the accident, your engine was on another switch? A. Yes, sir. Q. And this switch was open? A. Yes, sir; it was. _Q. And it was a main line switch? A. Yes, sir; it was. Q. And you had a flagman? A. Yes, sir. Q. And he was not at this open switch? A. No, sir; he was not. Q. And this open switch caused the accident? A. Yes, sir; it did. Q. And your contention is that you had a right to leave it open, under the standard regulation? A. Exactly. * * * Q. But you do admit that all of these standard rules say that these main track switches must be kept locked except when in charge of a switch tender? A. Yes, sir. Q. And you admit that you used two switches since rising this one? A. Yes, sir; I think I used four. A. And you left this switch open all the time? A. Yes, sir; I did.”
It is shown that the motorcar was moving, at the moment of the accident, at the rate of 20 or 30 miles an hour; that Dupuis, who was driving, was looking up the track and did not see the open switch; that Wright, the assistant foreman, who was seated on the right side of the car, saw it when too late; and that plaintiff, who was seated behind Wright, knew nothing of it until he heard Wright make a remark to the effect they were in for it. Plaintiff testifies, without contradiction, that he was never furnished with any copy of the company’s rules, and knew of no rule to the effect that a switch could be left open and unguarded. It is further shown that all the bones of plaintiff’s right arm were broken and that the arm will be of but little use to him for the balance of his life; that he received a laceration of the scalp some six or seven inches in length, which penetrated to the skull; that two of his teeth were driven through his lips; and that he was bruised about his legs. Thirteen hours elapsed before he reached the hospital at Shreveport, and he there remained under treatment for about five months, during which he suffered greatly. Since his discharge, he has not been able to obtain, or hold, any employment at which he could earn more than 50 cents, without board, in 24 hours, and his prospects for remunerative employment in the future are not encouraging.
Defendant’s rules, Nos.. 93, 104, 105, and 106 read:
“93. Within yard limits, the main track may be used, protecting against second class trains. Third class and extra trains must move within yard limits prepared to stop unless the main track is seen or known to be clear.”
“104. Switches must be left in proper positions after being used. Conductors are responsible for the position of the switches used by them and their trainmen, except where switch tenders are stationed. A switch must not be left open for a following train unless in charge of a train man of such train.
“105. Both conductors and engine men are responsible for the safety of their trains, and, under conditions not provided for by these rules, must take every precaution for their protection.
“106. In all cases of doubt or uncertainty, the safe course must be taken and no risks run.”
Opinion.
[1 -3] It must be understood that the “open switch” in this instance means that the switch was so arranged that south-bound cars would enter the siding, hut that northbound cars would inevitably be derailed. It will be understood, also, that, though the questions propounded to the witness Deloach suggest that the switch leading into the Big Pine Mill premises was but half a mile above that at which the accident occurred, the distance was nearer three-quarters of a mile, and that all we know about the situation of the mill itself is that, after entering the switch, the engine became lost to *145 siglit, and may have had several miles to travel before reaching the mill. As we have stated, there is a preponderance of evidence to the effect that, when, the motorcar reached the vicinity of the freight depot, there were neither cars nor anything else in the way of obstructions visible on the track, ahead of it. We find nothing in the rules which have been quoted which, in our opinion, authorizes a conductor or yardmaster in charge of a switching engine to open a switch within yard limits and leave ic open without a switch tender while he sends the engine to some place beyond the range of vision, upon a mission of indefinite duration, and is himself engaged in transacting business in the freight office at the station. Beyond that, if there were such a rule, we are of opinion that in this case it would have been, and was, inexcusable negligence in the officer to avail himself of such authorization, since he knew that there were men working at the bridge, above Colfax, who lodged and obtained their meals in the car below Colfax, and that they passed up and" down three times a day, at stated hours, between their lodging and eating house and their working place. He perhaps knew, too, that they were apt to make up time lost at dinner by extra speed in returning to work after dinner, and that, seeing a clear track ahead of them, with no switching operations apparent, it would not be likely to occur to them that a switch had been left open, even in the yards, inviting them to destruction. But, if it were otherwise, and there was fault in operating the motorcar through the yards at the speed attributed to it, it was not the fault of the plaintiff or of any one for whose acts he is responsible. He had been working for defendant for four years, and no one had furnished him with a copy of defendant’s rules or had informed him that there was any rule prohibiting the operation of a motorcar, on a track apparently free of obstruction, at 20 or 30 miles an hour, or that it was his duty to instruct the assistant foreman whom defendant had placed over him as to what he should do under any given circumstances. He was employed as a carpenter, and defendant undertook to carry him back and forth between his boarding car and his place of work, and it furnished the car for that purpose and put, not the plaintiff, but the assistant foreman, in charge of it, and he remained in charge, though he selected another of the workmen to operate the car. Plaintiff and the other workman did not, however, thereby become the fellow workmen of each other in the matter of the operation of the car, and, if they had, the fault of the workman who was so selected would not relieve defendant of its liability to plaintiff in the case here presented, since defendant was represented bn the car by its assistant foreman, and plaintiff had the right to assume that he would see to it that the car, operated in his presence and under his direct supervision, was operated properly, and not in violation of the rules with which he was familiar and plaintiff was not.
In Dobson v. N. O. & Western R. Co., 52 La. Ann. 1127, 27 South. 670, it appeared that plaintiff was foreman of a gang of laborers who were employed to load a train with dirt and unload it at a given point, after which they were being transported back to their homes, when an accident occurred in which plaintiff was injured. It was held that he was not the fellow workman of the conductor, ■ to whose fault the accident was attributed, and that he was entitled to recover.
In Evans v. Lumber Co., 111 La. 534, 35 South. 736, it was held that a “dogger,” in a sawmill was not the fellow servant of the sawyer. In Williams v. Lumber Co., 125 La. 1092, 52 South. 167, 136 Am. St. Rep. 365, 19 Ann. Cas. 1224, it was held that the engineer and acting conductor of a logging train was not the fellow servant of a brakeman. And in Bell v. Lumber Co., 107 La. 736, 31 *147 South. 994, it was held that the fault committed by the engineer of a logging train, having been committed in the presence, of defendant’s superintendent, must be regarded as having been committed by defendant, and that defendant was therefore liable to a person injured, even though he were a fellow servant of the engineer.
Plaintiff has filed no answer to the appeal, or application for amendment of the judgment appealed from, and it is therefore
Affirmed.